UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Tori Jacques,                                     \*
          Plaintiff                            \*
                                            \*
v.                                         \* Docket No.:
                                            \*
Sullivan County Department of Corrections, and  **\* JURY TRIAL DEMAND**
Dave Berry (Officially and Individually),      \*
          Defendants                      \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>COMPLAINT</u>

### I.     <u>NATURE OF THE CASE</u>

1.      In this action, the Plaintiff, Tori Jacques, (hereinafter Plaintiff or Ms. Jacques) seeks to recover damages from the Defendants, the Sullivan County Department of Corrections (hereinafter Defendant or SCDOC) and Dave Berry (hereinafter Defendant or Superintendent Berry), the Superintendent of the SCDOC, for damages sustained by the Plaintiff. The Defendants and/or their agents and employees caused the Plaintiff to suffer emotional distress over an extended period of time, and such emotional distress is ongoing and has physical manifestations. The Defendants either personally or through agents and employees sanctioned, oversaw, or tolerated a pattern of harassment against the Plaintiff, including but not limited to failing to address the Plaintiff's legitimate complaints, making false, slanderous, and libelous allegations against the Plaintiff, discriminating against the Plaintiff based on her gender, retaliating against her for reporting and complaining about sexual harassment against herself, fellow employees, and inmates at the prison, concerning which she had a duty,

1

consistent with New Hampshire public policy, to complain and report instances of discriminatory conduct that existed in a setting where employees traditionally have been all – male, and thereafter created psychological, economic, and social isolation of the Plaintiff, ultimately leading to her constructive discharge from employment with the Defendant SCDOC as a Correctional Officer.

## II.     PARTIES AND JURISDICTION

2.     The Plaintiff Tori Jacques resides at 5 Charlestown Road, Claremont, New Hampshire, 03743. The Plaintiff was an employee of the Defendant SCDOC.

3.     The Defendant SCDOC is a department of Sullivan County, New Hampshire. It operates a correctional facility located at 103 County Farm Road, Claremont, New Hampshire, 03743.

4.     The Defendant Dave Berry, at all relevant times, has been the Superintendent of SCDOC. His official address is the correctional facility located at 103 County Farm Road, Claremont, New Hampshire, 03743. At all relevant times, Defendant Berry was the Plaintiff's supervisor while she was an employee of SCDOC.

5.     This is an action brought by the Plaintiff under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Title VII prohibits any employer, employment agency, or labor organization from engaging in unlawful employment practices based upon an individual's race, color religion, sex, or national origin. 42 U.S.C. § 2000e.

6.     The Plaintiff, Tori Jacques, claims that she is the victim sexual harassment. Sexual harassment is a form of sex discrimination that Title VII prohibits. The Plaintiff claims that supervisory and co-employees of hers created a hostile

work environment when they physically and verbally sexually harassed a woman inmate in her presence while she was on the job at the Valley Street Correction facility in Manchester, New Hampshire.

7. With reference to the Plaintiff's claim under Title VII, this Court has original jurisdiction pursuant to 42 U.S.C. sec. 2000e-5(f) and 28 U.S.C. sec. 1331. Title 28 U.S.C. §1367(a) confers supplemental jurisdiction over Plaintiff's pendent state law claims because they are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy.

8. All of the discriminatory / retaliatory employment practices alleged herein were committed within the State of New Hampshire.

9. All conditions precedent to jurisdiction under §706 of the Title VII, 42 U.S.C. §2000e-5(f) and N.H. RSA 354-A: 21(a) have occurred or been complied with.

10. The Plaintiff timely filed an administrative claim for sex discrimination with the New Hampshire Rights Commission, with the Defendant SCDOC being named the Respondent and specifically notifying the Defendant Berry that the Plaintiff claimed that she was a victim of his wrongful and discriminatory conduct.

11. Thereafter, the Plaintiff requested a "right to sue" letter and received one from the EEOC, dated April 7, 2020.

12. This action is, in part brought under The New Hampshire Whistle Blower Protection Act, RSA chapter 275-E, New Hampshire's Law Against Discrimination, RSA chapter 354-A.

### III.    __FACTS__

13.    Tori Jacques was discriminated against by her employer, SCHOC, based on her gender (female) including by discriminatory treatment and sexual harassment; and in response to her reports of harassment to her superiors, including, but not limited to, Dave Berry, Superintendent of SCHOC, she was threatened with specific acts done to intimidate and coerce her into not reporting the harassment and who interfered with her rights to be free from sexual harassment and retaliation. Further, she was retaliated against, including by being excluded from advancement, being treated with gross disrespect and, ultimately by being constructively terminated from her employment.

14.    Ms. Jacques was hired as a Corrections Officer on or about June 18, 2016, by Respondent Sullivan County and assigned to the Sullivan County Department of Corrections' jail. During her tenure at the Department, she often found the work environment hostile to her and other women as well as to gay men.

15.    When Ms. Jacques was offered the spot for a second shift Corporal, she gladly accepted it. Upon receiving her badge, the Superintendent said in the presence of other staff: "There will be people who don't agree with us choosing you, but you will just have to ignore it." She understood him to be referring to her being a female in an overwhelmingly male populated Department.

16.    Soon after taking that position, Ms. Jacques became aware of negative comments and complaints made about her that had the effect of undercutting her ability to perform her duties effectively. She had been pulled aside by officers on shift, and

they told her that Sergeant Robinson in particular had a big issue with how she did a lot of things on the shift such as paperwork. She was publicly humiliated by Robinson to the staff whom she was supervising. Those Correctional Officers whom she was supervising had been convinced by Robinson that she was useless and had "no idea what she was doing or how to do her job".

17.    Sergeant Robinson said to her: "How does it feel to be Corporal Jacques and not be a certified training officer and Officer so and so is a trainer." Ms. Jacques had brought these things forward seeking help for issues she was having. She was not spoken to once by any higher above staff or even by Robinson himself with issues regarding her job performance. She expressed to Lieutenant Lockhart verbally how uncomfortable she was, and he told her to document and report stuff so things could be handed. Below are some of the multiple events which she had reported, mostly pertaining to the six-month time frame that she was a supervisor.

18.    Ms. Jacques had an Officer on third shift (Officer Dawson) whom she had approached after she had been told a few times that Sergeant Robinson was questioning Officer Dawson's sexual preferences or asking whether anyone knew if he was gay. Robinson had made these remarks publicly in the radio room on more than one occasion. Robinson said things such as: "He must be gay; all his friends are gay that work in law enforcement" and questioning publicly if anyone knew if he (Dawson) liked men.

19.    During a conversation with Dawson about such statements by Robinson and others, Ms. Jacques asked Officer Dawson if he had wanted her to speak,  or if he was comfortable with her speaking, to someone about this incident and he said,

"Please do." She reported the matter to Jane in Human Resources (HR).

20.	Ms. Jacques had also been approached by Correctional Officer Dias about comments being made during a snowstorm to an Officer that he should go "lay on his belly in the snow so we can find out how many inches we have out there" and "it must be under a few." As to this same officer, she had been told that someone in passing overheard a comment to this officer along the lines of "why do you sit down when you pee?" as he was exiting the bathroom and another comment made to this Officer about his "balls."

21.	Officers on Ms. Jacques' shift had approached her about rude and disrespectful comments about her personally. Her work performance and how she "did paperwork" was apparently "bothersome" to Sergeant Robinson. However, she had never been approached by Robinson about these issues in her work performance.

22.	Ms. Jacques was told that Robinson made comments about how she handled situations. When a CO had said "Jacques is our supervisor tomorrow" Robinson's response was: "I can't fucking stand her, don't even say her name around me". Robinson had also made comments about her tattoos and such saying they resembled "chicken asses" etc.

23.	When Ms. Jacques had formerly applied for a Corporal Position, prior to being a Certified Corrections Officer in the State of New Hampshire, she had received a lot of backlash and rude comments such as "why would she even put in for it, she hasn't been here long; " "she worked per diem for how long?" and "she's not even certified". She had approached him twice. She had told him they were

supposed to be a family and support everyone there not bring people down. He denied ever making such remarks.

24. Shortly after this Ms. Jacques had also applied for the C.E.R.T team twice. Her performance in participation such as the oral board and PT was negatively discussed to other staff members which had no involvement in this process. Comments had been thrown around in the HOC radio room "since when do we put females on C.E.R.T. anyway?" Due to the negativity and fear of backlash and being talked about badly if she did not "perform" up to "his standards" and because she was a female, she had decided she would no longer apply for C.E.R.T positions as they became available.

25. There were other staff members who had made Ms. Jacques feel uncomfortable at times. Often comments were made by male staff members at shift changes such as: "Your hair is so fucking sexy don't tell your girlfriend I said that." She was frequently placed in uncomfortable situations that she didn't know how to respond to without inviting more hostile comments.

26. In addition to making her complaints in writing to Human Resources, Ms. Jacques went there and spoke with a woman named Jane in person. She verbally gave her a lot of information that she had. She then provided a written statement and turned it over to the jail staff. She was immediately scolded and called into the superintendent's office. She was told, "You did not follow the chain of command, why would you ever go to HR with anything like this, this was solely reported to have somebody fired!" She explained she had not gone to have somebody fired. She was given sensitive information and she did not want the story to change via

chain of command which would verbally go through many people. She as a supervisor felt it was safe to keep these conversations private and the less people that had been informed of these rumors and comments the better.

27. Ms. Jacques had another incident when she reported back to Corporal Olson, who was always extremely rude towards females. She arrived at work at 7:00 p.m. for her scheduled 7:00 p.m. She was then screamed at in the lobby and shamed for not being there at 6:53 p.m. and was told the sergeant (who was not on shift that night) would be addressing it with her. At this point, she had felt as if she was just a lost cause. She had done a written report due to the hostility and harassment that she had received by this corporal and gave a report to the superintendent and lieutenant.

28. On December 19, 2018, at 15:5 Ms. Jacques received a text from Sergeant Estevez, stating as follows: "Hey so the Sup gave me a couple of reports that you put in regarding my shift. Can you come in 30 early Friday night so we can talk about it? They jumped the chain of command and idk why ttl thanks."

29. Her reported that she had confidentially done and addressed to the Superintendent and Lieutenant were then passed down to a sergeant who was not present to address an issue with a corporal that was supervising the shift. She again felt humiliated and discriminated for her original reports of what was going on at the jail. Nothing had been kept confidential and things were passed down to people who couldn't help fix the situation but make matters worse with no resolution to the problems. That is why she had found herself going to somebody who she thought would provide her help in such serious situations. Any report that was

made never had a resolution instead it had become a topic of choice of discussion amongst staff members not involved in the situation. This had caused an extreme amount of hostility of staff against staff. The passing along of reports just to pass them along to gossip had left herself and other staff feelings too intimidated to report situations.

30. In addition to the bullying, explicit and behavior solely used to harass other staff, someone somehow obtained a recording of a group of male staff members talking about how a new female was hired to only "Suck everyone off". Ms. Jacques did not make this recording. It was provided to her by a staff member who she was not sure how they had obtained it but the reasoning behind it seemed to be they felt compelled to do so as the hostility was out of control. Staff were constantly bashing and engaging in conversations that were especially derogatory towards female and gay staff members.

31. On another occasion she reported that a female inmate approach her while she was crying and emotional. She "needed" to talk to Ms. Jacques in private. She had disclosed to Ms. Jacques that a male staff member had discussed to a group of female inmates that he had told them "he got pepper spray on his penis and how bad it burned." Ms. Jacques could tell this inmate was uncomfortable. Ms. Jacques did everything she could do by protocol to comfort her. Ms. Jacques asked if she wanted to write a written statement. She wrote a statement, and Ms. Jacques followed up with a private report. Ms. Jacques had been consistently asked by this inmate if anyone had talked to her about what she had reported to her. Ms. Jacques had to always respond to her: "No. I have heard nothing yet."

32.     Ms. Jacques had an inmate feel violated by male staff and once she had reported
        this as she should. Administration had said they would get to it. The context of
        this report not being investigated in a timely manner put Ms. Jacques in a position
        with the inmate population that maybe she wasn't reporting things that were said
        to her in private. This situation was never addressed but instead swept under the
        rug and avoided like every other situation there that involved something of a
        sexual nature. Ms. Jacques felt as if this situation was ignored because it involved
        a female inmate as reported by her, a female CO.

33.     Ms. Jacques had furnished report after report to administration. She had staff
        members also furnish reports as well. The only people that had become part of the
        investigation as of January 15, 2019, were Officer Dias, Sergeant Robinson and
        Ms. Jacques. Sergeant Robinson was the main source of the vulgar and cruel
        statements and exposing staff with incidents that were not work related.

34.     The investigation of all these reports was conducted with a polygraph. The
        Superintendent allegedly had Robinson take a polygraph. The Superintendent
        claimed that there was "no way in hell" that Robinson ever said anything that Ms.
        Jacques had reported because he "passed his polygraph with a 99.97%". Ms.
        Jacques was then told that her reports of what she had heard of what was reported
        to her were "fabricated". She was told Robinson admitted to gossiping but what
        she reported about gay staff members and the female Sonders who quit due to the
        harassment was all a lie and that it was disgusting that she would "fabricate" a
        report about discriminatory conduct.

35.     Ms. Jacques had tried to explain herself and instead the Superintendent picked her

report up and slammed it down on his desk and said: "What you wrote in this report is so vulgar and disgusting I am not even going to read this again!"

36. Ms. Jacques was then given the option by the Superintendent to submit to polygraph exam but given the ultimatum that there was no way she would ever pass the polygraph as the person she had reported passed his. She was told she could take a polygraph and fail which would result in her being "Laurie listed" (as a dishonest police officer) and thus never be able to obtain law enforcement work in New Hampshire again.

37. The Superintendent told Ms. Jacques to leave and have an answer with what she wanted to do within a few hours. She left crying because she knew she reported what had to be reported but instead the findings of these incidents were not investigated. They relied on a polygraph which cannot even be used in court for criminal cases to determine the truth of the incidents in the reports. They had questioned her integrity and everything about herself. Not reporting what she had heard or had staff come to her about could not go unreported. She was fully confident with what she had done.

38. Moreover, the Superintendent had the polygraphs conducted in Belknap County where he was formally employed and knew the polygrapher as they "were friends" and the polygrapher "owed" the Superintendent of Sullivan County for trainings he has provided to him. Ms. Jacques had questioned the reliability of this as it was not a neutral party but yet a friend of the Superintendent who was already accusing her of being a "liar" to her face about the allegations she had reported.

39. In the circumstances, Ms. Jacques decided to not move forward. She had made to fear her future and her career path for doing the right thing. She felt as if she was out of options. She was scolded, yelled at and belittled in his office on December 20, 2018. She felt that she had no choice but to resign so she could not be threatened with losing all of her law enforcement credibility which she had worked at for years to obtain. She is a single mother who relied on her hard-earned income at Sullivan County to provide for her son and herself.

40. After Ms. Jacques was forced to quit her position at the Department, she applied for other law enforcement jobs. She was given a conditional offer of employment with Merrimack County Department of Corrections. Indeed, during the hiring process, she was greeted by staff who were excited to have her "on board" and they would "congratulate" her and "welcome" her.

41. On January 15, 2019, Ms. Jacques went to their facility at about 1:00 p.m. to turn in her background paperwork and the rest of her personal identification and training documents. She was then brought into the Superintendent's office. He immediately questioned her integrity. Superintendent Cunningham in the presence of the Captain of MCDOC said he had contacted Sullivan County and the had passed on to him that she "recorded staff". She had never been the one to record staff. He also said that she had talked and texted to inmates. She immediately felt uncomfortable and discouraged. Sullivan County had provided untrue information about her employment to a new potential employer. She felt as if they once again retaliated against her and were doing everything in their power to ruin her character. She had not engaged in any sort of illegal activity at the jail like they

had told Merrimack County during the process of them contacting people about her. They had slandered her making it nearly impossible to obtain employment in the field she specialized in. These statements had her walk out of their building feeling great amounts of ignominy. As she had stated before, she had made simple reports of misconduct. She then suffered the same consequences that she could have faced if she knew this information but never reported it. She felt attacked and that her reports had no credibility because she was a female reporting male staff.

42. Since leaving the Department, Ms. Jacques has, on three separate occasions, requested a copy of her personnel file. She had written and emailed, wrote a letter and physically gone to HR twice. The County has so far refused to give her a copy of her personnel file.

43. The retaliatory campaign to harm her stretched into the District Court. She was involved in a custody situation with her son's father. They both were working law enforcement at the time, which made it hard to come to a parenting agreement, so they sought legal help. She put in a motion to have the local judge recuse himself as he had known her son's father personally. The judge in court made a comment that he wasn't going to recuse himself because of her son's father but because of her. He stated that he knew her past and that, due to a recent incident knew she was "unstable." He then brought up that her "instability" caused her job loss at the House of Corrections. She knew that the clerk of court was dating the Lieutenant of the Sullivan County jail and Sergeant Robinson worked per diem at the court. Due to the context of this statement made by the judge, she felt that he had been

given false information and used it against her in her custody battle.

44.     Ms. Jacques was given the option of termination or resignation because her reports and complaints were found to be disturbing. She chose to resign because she assumed termination meant no further law enforcement career options while a resignation would allow her to pursue other options in law enforcement. She knew that she had done the right thing, so she resigned. She was treated by SCDOC as if she were terminated. She suffered severe mental distress. She was unable to seek help due to not having insurance any longer. The defamatory comments, bold faced lies and untrue statements have damaged her in many ways. She was stuck and unable to obtain employment in the field she had worked in since 2016. She found the career that made her happy and she took such great pride in doing to work every day. Her future has been ripped out of her hands and the defamatory comments have made people pass judgement and believe lies about her and therefore consider her unemployable.

45.     As a result of the above-referenced discrimination, intimidation and retaliation, she has suffered a loss of enjoyment of life, embarrassment, humiliation, career harm and financial losses in back pay, front pay and benefits and she seeks the same, plus, and including, but not limited to, compensatory damages, enhanced compensatory damages, all other damages to which she may be entitled, including, but not limited to, attorney fees and expenses, and punitive damages.

46.     Ms. Jacques also seeks the additional equitable relief of mandatory anti-discrimination training, including: for each employee at SCDOC on each shift

prior to his or her placement anywhere, at least one hour of paid time to watch, at the work site, a video, approved by the N.H. Commission for Human Rights, which includes training and written materials on all of the protected categories of employment discrimination recognized by state and federal law, the deadlines for filing at both the Commission and the EEOC and the contact information for both agencies, including the telephone numbers; and including the information that both N.H. and federal claims may be filed with the local Human Rights Commission, and including, but not limited to, the remedies available for successful claims of discrimination, and including, but not limited to, a special emphasis on the requirement to provide sexual harassment training for the protection of both employees and inmates.

## IV.   CLAIMS FOR RELIEF

**Count 1: Violations of Title VII**

The Plaintiff repeats and realleges the allegations in all preceding paragraphs as though more fully set forth herein.

47.   The actions of the Defendant as set forth above constitute sexual discrimination and retaliation in violation of Title VIL.

48.   As a direct and proximate result of those acts, the Plaintiff has been damaged and continues to be damaged.

49.   The Defendant is liable to the Plaintiff for the full amount of her damages.

**Count 2: Violations of RSA 354-A: 7 and RSA 354-A:19**

The Plaintiff repeats and realleges the allegations in all preceding paragraphs as though more fully set forth herein.

50. The actions of the Defendant as set forth above constitute violations of RSA 354- A: 7 and RSA 354-A:19.

51. As a direct and proximate result of those acts, the Plaintiff has been damaged and continues to be damaged.

52. The Defendant is liable to the Plaintiff for the full amount of her damages.

**Count 3: Defamation *per se* and *per quod* (Against Both Defendants)**

The Plaintiff repeats and realleges the allegations in all preceding paragraphs as though more fully set forth herein.

53. The Defendants, themselves and/ or through their agents and employees, did knowingly publish false statements about Plaintiff in the complaints, letters, reports, correspondence, and other writings, they each drafted, in writing and in spoken words to one another and others, including to would-be subsequent employers of the Plaintiff.

54. The above writing and oral falsities were published and republished to persons at the SCDOC and others. The falsities included allegations of criminal behavior, professional incompetence, and moral turpitude and reprehension.

55. The Defendants through their direct acts, and by causing one another or others to engage in similar acts placed Jacques in false light, and diminished his personal and professional standing in the community, and interfered with her ability to obtain substitute employment, diminished his past, present, and future income capacity, and her ability to work in law enforcement.

56. The Plaintiff has been damaged.

57.    The Defendants are, therefore, liable for these damages, which amount is within the jurisdictional limits of the Court.

## Count 4: Wrongful Termination (against SCDOC)

The Plaintiff repeats and realleges the allegations in all preceding paragraphs as though more fully set forth herein.

58.    At all times relevant hereto, it was the duty of SCDOC to provide Jacques with working conditions which were not so difficult and intolerable that an employee, situated as was Jacques, would be forced to resign or be otherwise rendered unable to engage in the employment.

59.    Jacques acted in furtherance of New Hampshire public policy and refused to act inconsistent with New Hampshire public policy.

60.    In retaliation, The SCDOC through the named Defendants engaged in a course of economic, psychological and social warfare against Jacques with the clear intent to render her employment at The SCDOC humanly intolerable.

61.    In subjecting Jacques to the course of retaliatory conduct set forth above, Defendants acting as agents, designees or employees of SCDOC, breached their duty and harmed Jacques, where such damages were entirely foreseeable, and include but are not limited to lost past, present and future wages and benefits, and present and future emotional and psychological distress.

62.    The SCDOC is vicariously liable as *respondeat superior* in that, at the time of the retaliatory course of conduct set forth above and leading to Jacques's constructive discharge, the named Defendants were acting, or purporting to act, within the scope of their designated duties.

63. Because Defendants' acts in constructively terminating Jacques were willful, wanton, or malicious, Jacques is entitled to recover enhanced compensatory damages.

**Count 5: Sexual Harassment / Aiding and abetting / Retaliation - RSA 354-A: 2, 7, 19 New Hampshire Law against Discrimination (against both Defendants)**

The Plaintiff repeats and realleges the allegations in all preceding paragraphs as though more fully set forth herein.

64. As more fully detailed above, the Defendants and/or their agents and employees did unreasonably interfere with Jacques's work performance by making inappropriate sexual references verbally, with the intent to create an intimidating, hostile, and offensive working environment.

65. The references made by the named Defendants did in fact interfere with Jacques's work performance and created an offensive, hostile, and intimidating working environment.

66. Jacques did report the conduct of actors engaged in prohibited conduct against herself and others sought to have that unlawful conduct investigated and corrected.

67. Instead the Defendants and / or their agents and employees in retaliation for her complaints twisted the facts to reach a purposely false conclusion; namely, that her conduct was untruthful and wrongful.

68. In recklessly and wantonly subjecting Jacques to the inappropriate sexual references set forth above, and retaliating against Jacques for having reported conduct in violation of The New Hampshire Law Against Discrimination, and

seeking to have discriminatory conduct investigated, corrected and stopped, the Defendants and / or their agents and employees did harm Jacques, where such damages were entirely foreseeable, and include but are not limited to lost present and future wages and benefits, and present and future emotional and physical distress.

69. The Defendants are therefore liable to Jacques for damages sustained, to include enhanced compensatory damages as provided in RSA 354-A:21, all of which are in an amount that is within the jurisdiction of this court.

## Count 6: Whistle Blower Protection Act - RSA 275-E (against SCDOC)

The Plaintiff repeats and realleges the allegations in all preceding paragraphs as though more fully set forth herein.

70. As more fully detailed above, Jacques did make complaints about the sexual harassment directed at herself and others including a female inmate at the prison while she was employed at the SCDOC.

71. In response to these complaints, the named Defendants did proceed with their retaliatory tactics by filing false complaints against Jacques, ultimately resulting in her being constructively discharged from her employment at SCDOC.

72. Jacques had complained of violations of state and federal laws as well as SCDOC policies. Jacques's actions were in good faith, intended to protect individual citizens, and further the interests and mission of the SCDOC.

73. Jacques was entitled to protection from retaliation for reporting said violations of the law, but instead she was the subject of further harassment and retaliation.

74. As a result of the harassment that took place in retaliation of Jacques's reporting the violations of law, she was damaged, where such damages were entirely foreseeable, and include but are not limited to: lost past, present and future wages and benefits, and present and future emotional and physical distress.

75. The Defendants are therefore liable to Jacques for damages sustained, to include attorney's fees for the cost of this litigation, pursuant to RSA 275-E: 2.

**WHEREFORE,** Plaintiff, Tori Jacques, respectfully demands that, after a full hearing on the merits, this Court enter judgment in her favor and against the Hillsborough County Department of Corrections for the full amount of her damages together with interest, costs and reasonable attorney's fees and grant her such other and further relief as this Court deems just and appropriate.

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

TORI JACQUES

By her attorneys,

SHAHEEN & GORDON, P.A.

Dated: 05/19/20        By: \s\ Francis G. Murphy
Francis Murphy, Esquire
NH BAR ID 1840
80 Merrimack Street
Manchester, NH 03101
(603) 669-8080
fmurphy@shaheengordon.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date below I electronically filed the foregoing

document using the CM/ECF system, which will send notification of said filing to all

counsel of record.

Dated: <u>05/19/20</u>                                    By: <u>\s\ Francis G. Murphy</u>
                                                                    Francis Murphy, Esquire